UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

STEVEN SAND,

             Plaintiff,

      v.                                   Case No. 19-C-348

MILWAUKEE COUNTY
HOUSE OF CORRECTION, et al.,

             Defendants.

## DECISION AND ORDER

Plaintiff Steven Sand is proceeding in this 42 U.S.C. §1983 case based on allegations that, while he was incarcerated at the Milwaukee House of Correction from June 1, 2018 to May 31, 2019, he was not provided with meals that complied with Jewish dietary laws. Sand sues the Milwaukee County House of Correction, Superintendent Michael Hafemann, and Milwaukee County (the County Defendants) as well as Aramark American Food Services Inc. and General Manager Brad Meyer (the Aramark Defendants). He also sues John and Jane Doe Defendants. This matter is before the Court on the parties' cross-motions for summary judgment, Sand's motion to strike, and his motion for leave to file additional evidence.

## PRELIMINARY MATTERS

On May 28, 2021, after the parties' summary judgment motions were fully briefed, Sand filed a Rule 7(h) expedited non-dispositive motion to strike and a motion for leave to file additional evidence. Dkt. No. 98. Sand asks the Court to strike Defendants' replies to his responses to their proposed statements of fact (Dkt. Nos. 87 and 91). He explains that Local Rule 56(b)(3)(B) allows parties to reply to additional facts submitted in opposition to the moving party's motion, but it does

not allow parties to reply to the non-moving party's responses to the moving party's proposed facts.

The County and Aramark Defendants oppose Sand's motion. They argue that their replies were warranted because Sand "chose to submit additional facts in his responses." Dkt. No. 100 at 1; *see* Dkt. No. 101 at 2-3. Defendants asserts that it would be unfair to strike their replies given that Sand "himself created the untenable situation by alleging new facts in his Responses to Defendants' PFOF instead of submitting the statement of additional facts as directed under the Rules." *Id.*

The Court agrees that, rather than utilizing the procedure in Civil L. R. 56(b)(2)(ii) to set forth additional facts, Sand opted to incorporate additional facts into his responses. In doing so, he denied Defendants the opportunity to reply to his additional facts as allowed by the rules. Accordingly, the Court will allow Defendants' replies and will deny Sand's motion to strike.

Sand also seeks to submit additional evidence in support of his assertions that he exhausted the available administrative remedies and/or that the administrative remedies were unavailable. Sand explains in a supporting declaration that he does not believe the County Defendants produced copies of all of the grievances, requests for officer interviews, requests for Aramark interviews, requests for clergy interviews, and/or appeals that he submitted at the House of Correction. Dkt. No. 99. Sand acknowledges that he did not maintain copies of everything he filed, but he is sure that he filed more documents than the County Defendants provided in support of its summary judgment motion. By way of example, Sand seeks to submit a copy of an appeal that he asserts he filed on March 28, 2019, following a grievance response dated March 26, 2019. *Id.* at ¶5. He explains that this appeal was produced in discovery but was not one of the documents submitted

2

by Defendants in support of their argument that Sand failed to properly appeal any of his grievances.

The Court will deny Sand's motion to submit additional evidence. Sand asserts that the appeal he wants to submit was produced in discovery, begging the question why Sand did not provide it in support of his response to Defendants' motions. He suggests that he seeks to provide this document now because, with their reply brief, the County Defendants filed the affidavit of Kathleen Sullivan, which lists the grievances/appeals in the House of Correction's records. This particular appeal is not included in that list. But Sullivan's declaration was first provided in support of the County Defendants' motion for summary judgment. In support of their reply, the County Defendants submitted Sullivan's *amended* declaration. The change to the amended declaration was to explain the grievance procedure in greater detail. The list of grievances/appeals in the *amended* declaration is unchanged from the list of grievances/appeals in the *original* declaration, which means Sand had an opportunity to provide this document along with his response materials. Sand provides no explanation of why he waited to submit this document until after briefing on the motions was completed.

In addition, the County Defendants assert that the "document is of uncertain origin" and that they "have been unable to verify its authenticity" or determine whether "Sand ever submitted [it] to the HOC." Dkt. No. 100 at 3. In light of Sand's unexplained delay and concerns about the document's origins, the Court concludes that allowing Sand to submit the document as evidence after the cross-motions have been fully briefed would prejudice Defendants. Therefore, the Court will deny Sand's motion to submit additional evidence.

Finally, the Court will dismiss the John and Jane Doe Defendants as well as the Milwaukee County House of Correction. In its May 13, 2019 scheduling order, the Court ordered that the

3

parties could amend the pleadings without leave of Court on or before July 9, 2019. Dkt. No. 20. The Court explained that Fed. R. Civ. P. 15 would apply to any amendment after that date. The U.S. Supreme Court has explained that, although under Rule 15 a court should freely give leave to amend when justice so requires, reasons such as undue delay and undue prejudice to the opposing party may be cause to deny the opportunity to amend. This case has been pending since early 2019, and Sand has had ample opportunity to discover the identities of the Doe Defendants. The Court finds that Sand cannot, at this late stage, amend his complaint to substitute new parties in place of the Doe placeholders. Accordingly, the Court will dismiss the John and Jane Doe Defendants based on Sand's failure to timely identify them.

As to the Milwaukee County House of Correction, it cannot be sued under §1983. That provision allows a plaintiff to sue a "person" who, acting under color of law, violates his constitutional rights. The Milwaukee County House of Correction is not a person—it is, as the Seventh Circuit has noted in similar circumstances, a building. *See White v. Knight*, 710 F. App'x 260, 262 (7th Cir. 2018). "[T]he fact that a building is owned by a corporate entity or a government agency does not make the building a suable person under § 1983." *Id.* The Court will dismiss the House of Correction. Doing so has no impact on Sand's claims against Milwaukee County.

## BACKGROUND

Sand was incarcerated at the Milwaukee County House of Correction from June 1, 2018 until May 31, 2019. While there, he enjoyed Huber work-release privileges. He was allowed to leave the House of Correction for up to twelve hours per day, six days per week, Monday through Saturday, for purposes of work and therapy. Sand exercised his Huber privileges approximately 310 of the 365 days he was at the House of Correction. Sand's Huber privileges were revoked on May 28, 2019, a few days before his release. Dkt. No. 91 at ¶¶1, 4-5, 8.

4

Sand is an Orthodox Jew. Dkt. No. 87 at ¶12. When he arrived at the House of Correction, he presented a letter from Rabbi Michael Feinstein stating that Sand "eats an exclusively kosher diet" and requested that he be provided "only food that is certified kosher and in its original packaging." Inmates at the House of Correction who wish to request a special diet to accommodate religious practices, must submit a completed Request for Interview Form. About once a week, volunteer chaplains compile a list of the special meal requests and email the list to the staff member working with Aramark, the House of Correction's food service vendor. Dkt. No. 91 at ¶¶11, 14.

According to Milwaukee County, the House of Correction has one religious diet policy, which does not identify any particular religion but is universally applicable to all religious diet requests. It states that the House of Correction will "provide inmates with a reasonable and equitable opportunity to observe their essential religious dietary practices within facility budgetary and security constraints" and that inmate requests for a religious diet "may be granted if providing the diet/meal is consistent with the House of Correction interests, including but not limited to: 1. Institutional order, 2. Institutional safety, 3. Institutional security, 4. Providing adequate nutrition to the inmate, 5. The operation of a uniform food service program." Dkt. No. 91 at ¶20.

The parties agree that Aramark's manual states that "[i]t is the correctional facility and not Aramark that decides which religious menu options are to be offered to inmates and which inmates are to receive a specific religious menu, as opposed to a standard, vegetarian, or medical diet." Dkt. No. 87 at ¶41. Further, "[a]lthough Aramark may provide the correctional facility with various religious menu options from which to choose, neither Aramark nor its dieticians have the authority to decide on their own to provide an inmate or group of inmates with a specific religious diet." Id. at ¶42. With regard to the contents of religious diets, the Aramark manual describes a lacto-ovo vegetarian diet as one that "may be applicable for Halal, Kosher, and/or other religious

5

types as determined by the facility administrator and/or religious authority." *Id.* at ¶44. Milwaukee County chose to utilize the lacto-ovo vegetarian diet at the House of Correction for religious accommodation meals, including kosher meals. *Id.* at ¶¶49, 92. Defendants assert that the meals Sand was provided met the dietary restrictions and requirements of his Jewish faith. Dkt. No. 87 at ¶58.

Sand explains that the lacto-ovo diet is *not* acceptable for kosher, and even if it were, he and other inmates were served food that is inconsistent with the lacto-ovo vegetarian diet. Dkt. No. 87 at ¶¶44, 49; Dkt. No. 85 at ¶5. According to Sand, on June 14, 2018, a rabbi advised the House of Correction chaplain that, even if ingredients are kosher, no food prepared in the prison kitchen can be considered kosher because even the slightest contact between a kosher and non-kosher item, implement, or surface will render a food item non-kosher. The rabbi further explained that, to be considered kosher, all prepackaged items should be served to the inmate recipient with packaging intact and that a kosher certification label must be visible. *Id.* Sand clarifies that serving any prepackaged food with a hechsher symbol would constitute a "certified" kosher meal because the hechsher symbol ensures that the food contained therein is kosher. Dkt. No. 87 at ¶29. The rabbi explained that whole uncooked fruits and vegetables would also be acceptable. *Id.*

Defendants agree that "certified" kosher meals must be prepared in a certified kosher kitchen under the auspices of a rabbi and require religious blessings. Dkt. No. 87 at ¶29; Dkt. No. 85 at ¶47. Defendants acknowledge that the House of Correction does not have a certified kosher kitchen. Dkt. No. 87 at ¶18; Dkt. No. 85 at ¶20.

On June 5, 2018, four days after Sand began his incarceration, Assistant Superintendent Jose Hernandez emailed Meyer, the general manager for Aramark, to request that Sand be added to the special religious diet list. Dkt. No. 91 at ¶¶15. As noted, Milwaukee County has decided

6

that inmates seeking kosher food accommodations are provided with a lacto-ovo vegetarian diet. Dkt. No. 91 at ¶16. Hernandez confirmed that Sand's request for a religious diet was approved and sent to Aramark and that Aramark would provide Sand with the lacto-ovo vegetarian diet. *Id.*; Dkt. No. 87 at ¶22 (Sand's special religious diet was noted as "Kosher diet (vegetarian diet) Jewish").

According to Sand, on days he left the institution for work, he would eat breakfast and dinner and the House of Correction and would be provided with a "to-go" bagged meal so he could have lunch at work. Dkt. No. 85 at ¶43. Sand asserts that none of the meals prepared in the House of Correction kitchen were kosher. *Id.* The House of Correction points out that Sand uses the term "kosher" without defining what he means. The County Defendants assert that, from June 5, 2018 through March 19, 2019, Sand was given lacto-ovo vegetarian meals consistent with his request for a religious accommodation, and from March 19, 2019 until his release, he received prepackaged certified kosher meals for lunch and dinner from Spring Valley, an outside vendor. *Id.* at ¶41.

Sand explains that he would refuse to eat "the vast majority" of the meals the House of Correction provided and would instead, when on Huber release, stop at a grocery store to purchase kosher food. Dkt. No. 85 at ¶44. He asserts that he made multiple requests for kosher meals, including filing grievances about the food he was provided. *Id.* at ¶48; Dkt. No. 87 at ¶54. According to Sand, he received many meals that were labeled kosher but that contained food that violated the basic tenants of Jewish dietary law. Dkt. No. 85 at ¶¶62, 85(a)-(b). By way of example, Sand explains that he once received a bologna and cheese sandwich and another time he received gravy containing non-kosher sausage. *Id.* at ¶¶62, 102, 104. Sand asserts that he offered multiple potential solutions, including explaining to staff what kosher meant, trying to find an

7

outside source to provide food, and having the House of Correction purchase meals and then deduct the cost from his account. Dkt. No. 87 at ¶55.

Defendants dispute that Sand merely requested kosher food; they assert that he demanded "certified kosher food." Dkt. No. 85 at ¶49; Dkt. No. 87 at ¶50. They highlight that Sand's rabbi wrote that Sand must be provided "only food that is certified and in its original packaging." Dkt. No. 87 at ¶50. They also note that Sand filed numerous grievances that were predicated on his insistence that he be provided only "certified kosher food." *Id.* at ¶55.

On August 21, 2018, the House of Correction responded to Sand's grievances by offering him "the opportunity to speak to your Rabbi and ask if your place of worship would be able to bring in certified kosher meals," explaining that the arrangement would be conditional upon Sand's agreement that the meals would be scanned upon arrival, stored in the Huber area and warmed in a microwave kept there, and that Sand would be required to sign a waiver releasing the House of Correction from responsibility should Sand become ill or react to anything brought in. Dkt. No. 91 ¶52; Dkt No. 85 at ¶67. Sand asserts that, after contacting Jewish places of worship, he requested a waiver on multiple occasions, but the House of Correction refused to provide him with one. Dkt. No. 85 at ¶68. The House of Correction explains that it refused to provide a waiver because Sand never presented a plan or identified a religious institution that would be willing to deliver meals. Dkt. No. 91 at ¶53. The House of Correction asserts that it could not prepare a waiver form without an identified institution or plan. *Id.* Sand concedes that he was not able to coordinate the delivery of *daily* meals, but he asserts that members of the Shul and Chabad of Kenosha would have been able to deliver scheduled meals. Dkt. No. 85 at ¶69. Sand does not provide additional details, and it is not clear if Sand communicated this arrangement to the House of Correction.

8

Hafemann, the House of Correction superintendent, searched on the internet to see if there were local certified kosher kitchens or sources where the House of Correction could purchase a prepared meal that would fulfill Sand's kosher requirement, but he was not able to find anything local. Dkt. No. 85 at ¶93. Hafemann also was not able to find local religious institutions that could provide Sand with certified kosher meals. *Id.* It is not clear to the Court when Hafemann made these efforts.

Sand also tried to bring in kosher food that he obtained while on Huber release, but the House of Correction prohibited him from doing so and would throw the food away. Dkt. No. 85 at ¶¶71-72. House of Correction rules prohibit inmates from bringing their own food into the facility because of contraband concerns, thereby violating safety protocols. *Id.*

On December 29, 2018, Sand refused to eat the dinner that was provided to him because it contained non-kosher food. He asserts that he was told that if he refused to eat the meal, he would be considered to have gone on a hunger strike and placed in solitary confinement on suicide watch. Dkt. No. 85 at ¶113. According to Sand, he was concerned that, if he were placed in solitary, he would lose his Huber privileges and would not be allowed to leave the institution, which was the only way he obtained his kosher food. *Id.* at ¶114. Sand states that he was "humiliated and mortified" that he was forced to choose between consuming non-kosher food or being placed in solitary confinement. *Id.* at ¶115. According to Sand, that was when he decided to pursue this lawsuit. *Id.* at ¶116.

On January 9, 2019, following efforts by Sand's rabbi to bring attention to Sand's concerns, the House of Correction advised Aramark that, "the debate on the Kosher diet concerning inmate Sand continues to be pushed, now through political avenues and is drawing unwanted attention. In the event prepackaged kosher meals are the direction we are forced to go does Aramark have a

source for these type of meals?"  Dkt. No. 85 at ¶124.  Later that day, Aramark advised that the House of Correction had three options for Sand's meals: (1) keep providing Sand with meals consistent with a lacto-ovo diet, (2) purchase pre-packaged meals for $5.00 (noting that due to price, facilities are trying to break away from providing this type of meal), or (3) provide a kosher entrée option similar to what was being provided at another institution where Aramark served as the food service provider.  *Id.* at ¶126.

The House of Correction chose to pursue the second option, and beginning in March 2019, Sand was provided with Spring Valley prepackaged certified kosher meals.  Dkt. No. 87 at ¶64; Dkt. No. 85 at ¶134.  The plan was that Aramark would purchase the pre-packaged certified kosher meals and then charge the House of Correction for the additional cost of the meals, which the House of Correction would then recover from Sand.  Dkt. No. 85 at ¶136; Dkt. No. 91 at ¶60. However, ultimately, Sand was charged for, at most, three meals; Aramark ended up absorbing the cost difference between a general population meal and Sand's certified kosher prepackaged meals. Dkt. No. 85 at ¶136.

Sand explains that, even after he began receiving prepackaged meals, Aramark provided him with breakfast because Spring Valley did not have a kosher breakfast option.  Dkt. No. 85 at ¶138.  The County Defendants explain that they had reached an agreement with Sand that he would receive two hardboiled eggs and pre-packaged kosher oatmeal served in a sealed container for breakfast.  Dkt. No. 91 at ¶62; Dkt. No. 76 at ¶138.  Sand asserts that they had agreed the eggs would be kosher, but Aramark prepared non-kosher eggs in the House of Correction kitchen and then sealed the eggs along with the oatmeal packet to make it appear as though the eggs were kosher.  Dkt. No. 91 at ¶62.  Sand complained that he had not agreed to non-kosher eggs, that the packaging was not proper according to kosher standards, and that the tray the food was served on

10

was not certified kosher. *Id.* at ¶64. Sand also complained about the oatmeal packet even though it contained the hechsher symbol that Sand had previously noted would be adequate. *Id.*

According to Sand, on March 25, 2019, he advised the House of Correction of the upcoming Passover holiday that would occur from April 19 to April 27, 2019. Dkt. No. 76 at ¶140. Sand asserts that he explained that his diet would need to change—Jews are prohibited from eating grains and legumes and must eat a Passover kosher diet. *Id.* Sand also asserts that he stated that he would need to observe the seder on the first two nights of Passover. *Id.* According to the County Defendants, on March 27, 2019, a lieutenant asked Sand to identify anything he would need the House of Correction or Aramark to provide for the Passover celebration. Dkt. No. 91 at ¶67. They assert that Sand did not provide any written information until April 16, 2019. *Id.* Sand asserts that he printed emails dated March 28, 2019 and placed them in a lieutenant's grievance box as requested, but the County Defendants assert that staff did not receive anything from Sand until April 16. *Id.*; Dkt. No. 76 at ¶141.

A lieutenant informed Sand via email that she had contacted the Aleph Institute on April 17, 2019, to request that it send Passover meals for Sand, but the institute had not responded. Dkt. No. 91 at ¶68. The lieutenant informed Sand he would receive a prepackaged meal from Spring Valley for Passover. *Id.* On April 23, 2019, the Aleph Institute responded to the lieutenant and informed her it would send food for the remaining days of Passover. *Id.* With the agreement of Sand, the House of Correction stored the food in the Huber area. *Id.*

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the Court must view the evidence

11

and draw all reasonable inferences in the light most favorable to the non-moving party. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)). In response to a properly supported motion for summary judgment, the party opposing the motion must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ANALYSIS

### I. Exhaustion of Available Administrative Remedies

The Prison Litigation Reform Act, which applies to this case because Sand was incarcerated when he filed his complaint, provides that a prisoner cannot assert a cause of action under federal law "until such administrative remedies as are available are exhausted." 42 U.S.C. §1997e(1). According to the U.S. Supreme Court, exhaustion of administrative remedies must be done "properly" because "no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). To properly exhaust administrative remedies, prisoners must file their inmate complaints and appeals in the place, at the time, and in the manner that the institution's administrative rules require. *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002).

That said, a prisoner is not required to exhaust the administrative remedies if those remedies are not "available." *Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006). Administrative remedies will be deemed "unavailable" when prison officials do not respond to a properly-filed inmate complaint or when they prevent a prisoner from exhausting through affirmative misconduct, such as denying a prisoner necessary forms, destroying a prisoner's submissions, or requiring steps not mandated by regulation or rule. *See Smith v. Buss*, 364 F. App'x 253, 255 (7th Cir. 2010); *Pavey v. Conley*, 544 F.3d 739, 742 (7th Cir. 2008); *Kaba*, 458 F.3d at 684; *Dale v. Lappin*, 376 F.3d 652, 656 (7th Cir. 2004); *Strong v. David*, 297 F.3d 646, 649-50 (7th Cir. 2002).

Under the House of Correction grievance policy, an inmate must file a grievance within fourteen days of the complaint or issue. Dtk. No. 54-4 at 2. Upon receiving a grievance, a House of Correction Supervisor will "ensure that the grievance is investigated and resolved or denied in a timely manner, as established by the Superintendent." *Id.* An inmate may appeal the finding of a grievance after receiving a response to the original grievance. *Id.* at 3.

The County Defendants assert that, although Sand was repeatedly advised that the grievance process was the appropriate venue for him to raise his complaints, Sand failed to timely appeal any of his grievances. Defendants note that Sand received grievance responses on August 21, 2018; November 21, 2018; January 13, 2019; January 30, 2019; and March 26, 2019, and officer responses on October 8, 2018; October 18, 2018; October 24, 2018; October 22, 2018; and January 27, 2019, but Sand's only effort to appeal was on December 20, 2018, more than fourteen days after any of the responses he received. Further, Defendants assert that Sand filed no grievances (let alone appeals) relating to his equal protection claim based on allegations that Muslim inmates receive preferential treatment.

Sand asserts that many of his grievances went unanswered or that he received responses long after he submitted his grievances. He also notes that the grievance policy the House of

13

Correction relies on was created *after* he was released and references the submission of grievances through a kiosk that did not exist until near the end of his time at the House of Correction. With regard to his equal protection claim, Sand asserts that he filed grievances about Passover, but could not file one about Ramadan because "Ramadan occurred after Passover and Sand was not a Muslim inmate." Dtk. No. 80 at 8-9. Sand also highlights that, although Ramadan started while he was incarcerated, it did not end until after he was released.

The Court finds that the grievance procedures were unavailable to Sand. With regard to his complaints about not being provided kosher or certified kosher meals, the record shows that Sand filed a grievance on July 23, 2018. The next day, a grievance response request was prepared asking Aramark to "provide a response in a format that can be forwarded to the inmate by:7/29/2018." Dkt. No. 56-29. There is no evidence suggesting that a response was ever provided to Sand. Sand then filed grievances on August 16 and 18, 2018. He received a response on August 21, 2018, which he appealed on December 20, 2018. Dkt. No. 56-13. Under the procedures, that appeal was untimely. However, Sand also filed grievances on September 6, September 13, September 30, and October 6, 2018. *See* Dkt. No. 56. Sand did not receive responses to any of these grievances. The first response he received after the August 21 response was on October 8, 2018, in a response to a grievance he had submitted earlier that day.

"Inmates must exhaust *available* administrative remedies, 42 U.S.C. § 1997e(a), and a remedy can be unavailable if jail officials do not respond to the grievance." *Banks v. Patton*, 743 F. App'x 690, 695 (7th Cir. 2018) (emphasis in original) (citing *Pyles v. Nwaobasi*, 829 F.3d 860, 864 (7th Cir. 2016)). Further, "[i]n order to exhaust their remedies, prisoners need not file multiple, successive grievances raising the same issues . . . ." *Turley v. Rednour*, 729 F.3d 645, 650 (7th Cir. 2013). "[O]nce a prison has received notice of, and an opportunity to correct, a

14

problem, the prisoner has satisfied the purpose of the exhaustion requirement." *Id.* As Sand asserts, the evidence shows that he filed numerous grievances that were never responded to. Because Sand could not have appealed a response he never received, the administrative remedies were unavailable to him.

The Court also finds that the administrative remedies were unavailable as it relates to his equal protection claim. Sand asserts that he did not know Muslim inmate requests relating to Ramadan were treated differently than Jewish inmate requests relating to Passover until the period of Ramadan, which started near the end of his incarceration and continued after his release. While Sand *could have* filed a grievance while he was still incarcerated, nothing in the House of Correction's grievance procedures required him to. The procedures allowed Sand to file a grievance within fourteen days of the complaint or issue, and Sand's "complaint or issue" about the treatment of Muslim prisoners compared to Jewish prisoners continued right up until the day he was released. The House of Correction's grievance procedures are silent regarding whether or how a released prisoner must grieve a complaint or issue.

The Seventh Circuit has explained that "[p]risoners are required to exhaust grievance procedures they have been told about, but not procedures they have not been told about." *King v. McCarty*, 781 F.3d 889, 896 (7th Cir. 2015); *see Hernandez v. Dart*, 814 F.3d 836, 842 (7th Cir. 2016) ("It is not incumbent on the prisoner 'to divine the availability' of grievance procedures."). Because Sand was not told of the procedures he should comply with following his release, the Court finds that the administrative remedies were unavailable to him.

15

## II. The Merits

### A. First Amendment Free Exercise Claim

The Free Exercise Clause of the First Amendment prohibits the government from imposing a "substantial burden" on a "central religious belief or practice." *Kaufman v. Pugh*, 733 F.3d 692, 696 (7th Cir. 2013). But, "the religious freedom guaranteed by the Free Exercise Clause of the First Amendment does not require religious exemptions from facially neutral laws of general applicability." *Korte v. Sebelius*, 735 F.3d 654, 671 (7th Cir. 2013) (citing *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 883–90 (1990)). Neutral laws of general applicability need only satisfy a basic test of rationality—if a law incidentally burdens the exercise of religion, the Constitution does not require an exemption. *Id*. (citing *Smith*, 494 U.S. at 878–79, 888–90).

When "a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.'" *O'Lone v. Shabazz*, 482 U.S. 342, 349 (1987) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). This "reasonableness test" is "less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights," in recognition that "limitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives." *O'Lone*, 482 U.S. at 349-350 (citations omitted).

The Supreme Court has set forth a four-factor test to determine whether a prison regulation is unreasonable. *Turner*, 482 U.S. at 84-91. First, there must be a "'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Id*. at 89. Second, whether there are "alternative means of exercising the right that remain open to prison inmates" must be assessed. *Id.* at 90. Third, "the impact accommodation of the asserted

16

constitutional right will have on guards and other inmates, and on the allocation of prison resources generally" must be determined. *Id.* at 90. And, fourth, "the absence of ready alternatives" to the regulation must be examined. *Id.*

According to the County Defendants, operational necessity and budgetary concerns dictated their response to Sand's requests for kosher meals. They explain that, because House of Correction does not have a kosher kitchen and because Sand was not able to find a third-party willing to deliver kosher meals, "the only way the Defendants could provide Mr. Sand with the accommodation that he requested was to special order prepackaged meals from Aramark's vendor, Spring Valley, which cost approximately five times the amount of a standard inmate meal." Dkt. No. 51 at 18. The County Defendants explain that the House of Correction was concerned that, if it provided this accommodation to Sand, it would be inundated with requests for prepackaged, certified kosher meals from other inmates, which would disrupt the food service program and which could not be sustained by the House of Correction's budget. Accordingly, the County Defendants believed that offering Sand a lacto-ovo diet, which was kosher-compliant in substance but not in preparation was a reasonable accommodation.

Sand asserts that providing him with a lacto-ovo diet was not an accommodation at all. As he and his rabbi repeatedly informed staff at the House of Correction, food is kosher based not only on what food is served but also based on how the food is prepared. Because the House of Correction does not have a kosher kitchen, no food prepared in its kitchen could be kosher. Sand also highlights that, from the beginning, he offered to arrange delivery of meals and pay for the prepackaged meals, thereby undermining the County Defendants' purported reliance on operational and budgetary concerns.

17

Finally, the Aramark Defendants make many of the same arguments that the County Defendants make; however, they also explain that they had no authority to "accede to [Sand's] demands given that Aramark simply provided the diet to [Sand] as specified in its contract with the [House of Correction]." Dkt. No. 62 at 13. The Aramark Defendants explain that, during the negotiation process, Aramark provided the House of Correction with various menu options, including options to satisfy religious diet requests. The House of Correction decided both which inmates would receive special accommodations as well as the special accommodations an inmate would receive. Aramark simply delivered the menus specified by its contract and lacked any authority to deviate from the contract.

Beginning with the Aramark Defendants, the Court finds they are entitled to summary judgment on Sand's First Amendment claim. Defendants are liable for damages under §1983 only if they are personally responsible for the deprivation of a constitutional right. *See Williams v. Shah*, 927 F.3d 476, 482 (7th Cir. 2019). The Seventh Circuit has repeatedly explained that there is no general duty of rescue under §1983, so just because someone knows about a wrong does not mean they must do something to fix it. *Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir. 2009).

No jury could reasonably conclude that the Aramark Defendants created or enforced the policy regarding which inmates would receive religious accommodations and how those inmates would be accommodated. The House of Correction decided to provide Sand with a lacto-ovo diet in response to his request, and after communicating that decision to Aramark, that is what Aramark provided.[1] Aramark did not have the authority or discretion to determine which inmates would be

---

[1] Sand asserts that, during the year he was incarcerated, some of the meals provided by Aramark did not comply with the requirements of a lacto-ovo diet; however, he provides no evidence supporting a conclusion that these sporadic and infrequent violations were anything other than the product of negligence, which is insufficient to support a constitutional claim. There also is no evidence supporting a conclusion that Aramark had a policy of providing food items that were inconsistent with a lacto-ovo diet or that Aramark refused to correct errors when it learned of them.

18

provided with religious diets or what items would be served once a religious diet was approved. That authority and discretion resided solely with the County Defendants, which is why, when Sand raised his concerns with Aramark staff, they addressed his complaints by directing him to House of Correction staff. Aramark did not ignore Sand; they informed him who to contact to obtain the accommodations he wanted.

In fact, Aramark demonstrated its responsiveness to Sand's requests when, in March 2019, the House of Correction finally requested that it provide alternative options for Sand's meals. Meyer provided three options that very day, and, after being informed of the new agreement between Sand and the House of Correction, Aramark began serving breakfast in accordance with that agreement. Because the Aramark Defendants were not responsible for deciding how Sand's religious diet request would be accommodated and because they did not intentionally deviate from the accommodation dictated to them by the House of Correction, they are entitled to summary judgment on this claim.

Applying the *Turner* factors to Sand's First Amendment claim against the County Defendants, the Court finds that the first factor (whether a valid, rational connection exists between the regulation and a legitimate government interest) and the third factor (the impact an accommodation would have on the allocation of prison resources) weigh in the County Defendants' favor. They have identified operational and budgetary concerns as the reason why they provide a lacto-ovo diet in response to a request for kosher food. They explain that constructing a separate kosher kitchen is impractical and purchasing prepackaged meals at five times the cost would strain an already burdened budget.

However, the Court finds that a jury could reasonably conclude that the second factor (whether there are alternative means of exercising the right that remain open to a prison inmate)

19

and the fourth factor (the existence of obvious, easy alternatives) could weigh in favor of either the County Defendants or Sand. A couple months after Sand entered the House of Correction and it became clear that no food prepared by Aramark in the House of Correction kitchen would satisfy Sand's request for kosher food, Sand was given the opportunity to find a religious institution willing to deliver kosher meals. The County Defendants assert that Sand never followed up on this offer. Although he demanded a waiver, he never provided details to the County Defendants about who would provide the meals or when/how the meals would be delivered. Sand asserts he found a religious organization willing to provide meals, but he provides no details about the number of meals that would be provided or when the meals would be delivered, making it uncertain whether Sand's option would have been consistent with operational or security concerns at the House of Correction. More importantly, Sand does not assert that he ever provided the requested information about the delivery to the County Defendants. Given security concerns, the House of Correction's refusal to provide Sand with a blank waiver form appears reasonable.

The County Defendants also offer that Sand was free to purchase kosher food during the many hours he worked outside the institution. While at first blush this appears like a reasonable alternative, Sand explains that he was frequently unable to take advantage of this option. Sand notes that he had little free time at the beginning of or during his workdays and so often had to wait until the end of the day before he was able to get to a store. He also asserts that he could not consistently leave food in his work vehicle overnight because it would spoil in the summer and freeze in the winter. Sand asserts that he eventually obtained a cooler to store his food in, but it was still difficult to locate prepared kosher food to purchase. It is not clear if Sand communicated these challenges to the County Defendants to give them an opportunity to address them. And, although Sand spent *most* of his days outside the institution, he did not spend *all* of his days outside

20

the institution. It is unclear what alternatives, if any, the County Defendants offered Sand on those days he did not leave the House of Correction.

Finally, Sand notes that, after nearly seven months of offering to pay for prepackaged meals, the County Defendants finally asked Aramark to provide options. Sand asserts that this request and the subsequent decision to purchase prepackaged meals could have been made many months earlier. But the County Defendants explain why they were reluctant to go this route. Although Sand had offered to pay for his own meals, other inmates would not know he was doing so and would potentially demand similar accommodations, necessitating time and resources to vet and respond to the demands. And, more to the point, Sand ended up *not* paying for most of his prepackaged meals despite the agreement that he would do so, supporting the House of Correction's concerns about the financial burden of this arrangement. It is not clear why Aramark absorbed the increased costs, but perhaps the added administrative load of tracking and collecting the costs from Sand was too burdensome, which also confirms the County Defendants' concern about the impact of this arrangement on its operations.

The County Defendants have explained why they have a policy of providing a lacto-ovo diet in response to an inmate's request for kosher food. But Sand has explained why food that is kosher in substance but not in preparation is not kosher at all. As to the alternatives to this policy, questions exist about whether putting the burden on Sand to find a religious institution willing to provide him meals was a reasonable alternative, and, if so, whether that alternative was actually available to him given the denials to his repeated requests for a waiver. Questions also exist about whether allowing Sand to pay for prepackaged meals was such a disruption to the House of Correction's operations and budget that it could not be considered an obvious, easy alternative. Finally, questions exist about whether Sand obtaining food while he was on Huber release was a

21

sufficient alternative in light of the challenges Sand asserts he faced in procuring and storing food and in light of the fact that he was not released every day. Given these questions, neither the County Defendants nor Sand are entitled to summary judgment on this claim.

The County Defendants also assert that they are entitled to qualified immunity on Sand's First Amendment claim. They argue that "Sand does not have a clearly established right under the First Amendment to be served exclusively prepackaged, certified kosher food." Dkt. No. 51 at 13. That may be, but the County Defendants mischaracterize Sand's request for kosher food. Sand explains repeatedly that his request for prepackaged food was based on the fact that the House of Correction does not have a kosher kitchen. Sand demanded prepackaged food to ensure that the food he ate had not been prepared onsite because he knew that any unpackaged food (apart from whole fruits and vegetables) prepared in the House of Correction kitchen was not kosher.

The County Defendants rely on *Andreola v. Wisconsin*, an unpublished decision that affirmed the district court's denial of a motion for preliminary injunction. 171 F. App'x 514 (7th Cir. 2006). The Seventh Circuit explained that "the first amendment does not require prisons to accommodate every element of each inmate's faith; there are so many variations that the enterprise would be both costly and unavailing (for perfect implementation cannot be assured at any cost)." *Id.* at 515-16. Later, also in an unpublished decision, the Seventh Circuit affirmed the district court's decision to grant summary judgment to the jail defendants, explaining that "the defendants were not required to spend an additional $2,000 to provide [the plaintiff] with prepackaged kosher meals . . . [because] defendants have a legitimate interest in abating the costs of a prisoner's keep." *Andreola v. Wisconsin*, 211 F. App'x 495, 499 (7th Cir. 2006).

The obvious difference in this case is that, from the beginning, Sand offered to pay for prepackaged kosher meals. He did not, as the plaintiff in *Andreola* did, demand that the institution

absorb those costs. While containing costs is a legitimate and compelling interest, the County Defendants cannot hang their hat on that interest given Sand's willingness to personally absorb those costs. The evidence shows that other alternatives were also available, including having others deliver kosher meals to the institution, although it is unclear how disruptive such a plan would be to institution operations.

It has long been established that prisoners have a First Amendment right to reasonable opportunities to practice their religion subject to the legitimate penological concerns of the prison. *Maddox v. Love*, 655 F.3d 709 (7th Cir. 2011). As Sand points out, a "litany of decisions from this Circuit and the Supreme Court confirm that refusing to provide an inmate with a meal that conforms to his religious practices violates the First Amendment and constitutes a substantial burden on the inmate's religious exercise." Dkt. No. 80 at 10 (citing *Thompson v. Holm*, 809 F.3d 376, 380 (7th Cir. 2016)); *see Thompson v. Bukowski*, 812 F. App'x 360, 365 (7th Cir. 2020) ("forcing an inmate to choose between daily nutrition and religious practice is a substantial burden"). The County Defendants are not entitled to qualified immunity on this claim.

### B. Fourteenth Amendment Equal Protection Claim

The Equal Protection Clause of the Fourteenth Amendment provides that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). In the context of prisons, however, "[u]nequal treatment among inmates . . . is justified if it bears a rational relation to legitimate penal interest." *Williams v. Lane*, 851 F.2d 867, 881 (7th Cir. 1988) (citing *Hudson v. Palmer*, 468 U.S. 517, 522–523 (1984)). The Supreme Court has held that not "every religious sect or group within a prison—however few in number—must have identical facilities or personnel." *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972).

23

In order to establish an equal protection violation, a plaintiff must allege and prove "the existence of purposeful discrimination." *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987)). An inmate must show that he was treated differently than similarly situated prisoners and that there was no rational basis for the difference in treatment." *Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). It is not enough for one to merely show that other prisoners were treated differently. "In order to succeed on an equal protection claim, a plaintiff must show intentional or purposeful discrimination suggesting that 'the decisionmaker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effects on the identifiable group.'" *Nkrumah v. Clark*, 977 F.2d 585 (7th Cir. 1992) (quoting *Shango v. Jurich*, 681 F.2d 1091, 1104 (7th Cir. 1982)).

Sand asserts that Defendants discriminated against him because Muslims are offered special meals and accommodations for Ramadan, but he was denied special meals and accommodations for Passover. The evidence shows otherwise. Sand asserts that, on March 25, 2019, he alerted staff to his need for special meals during Passover, which was to occur from April 19 to April 27, 2019. Two days later, a lieutenant contacted Sand and asked him to identify what he needed the House of Correction and Aramark to provide. Sand asserts that he contacted his rabbi and the next day, printed the materials sent to him, and placed them in an internal grievance box for the lieutenant. The County Defendants assert that staff did not receive anything from Sand until April 16. On April 17, the lieutenant informed Sand she had contacted the Aleph Institute to request that it send Passover meals for Sand, but it had not responded. The institute finally responded on April 23 and provided meals for the remainder of Passover.

Although Sand asserts he tried to deliver the materials on March 28, he provides no evidence rebutting Defendants' assertions that the materials were not received until April 16. The

evidence shows that House of Correction staff acted promptly to address Sand's requests to ensure he was able to celebrate Passover consistent with his beliefs. No jury could reasonably conclude that he was treated differently than Muslim inmates desiring to celebrate Ramadan. Defendants are entitled to summary judgment on this claim.

### C. Religious Land Use and Institutionalized Persons Act (RLUIPA)

RLUIPA governs religious exercise by institutionalized persons. §2000cc–1; *Holt v. Hobbs*, 574 U.S. 352, 357 (2015). RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." §2000cc–1(a); *Holt v. Hobbs*, 574 U.S. 352, 357–58 (2015).

Aramark asserts that it cannot be liable under RLUIPA because RLUIPA applies only to the "government" and not private companies. But the Act defines "government," in part, as "any other person acting under color of State law," and it has long been held under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), that a private company that performs a state function can be held liable to the same extent as a state actor. 42 U.S.C. §2000cc-5(4); s*ee Rice ex rel. v. Correctional Medical Services*, 675 F.3d 650, 675 (7th Cir. 2012). Still, Sand's RLUIPA claim against Aramark fails for the same reason his First Amendment claim fails: Aramark was not responsible for deciding whether or how Sand's request for a kosher diet would be accommodated.

Milwaukee County asserts that Sand's RLUIPA claim must be dismissed because the only relief available under RLUIPA is prospective injunctive relief, which means Sand's claim became

moot once he was released from the House of Correction. Milwaukee County relies on *Thomson v. Bukowski*, which the Seventh Circuit decided last year. 812 F. App'x 360 (7th Cir. 2020). There, the appellate court held that a prisoner's transfer from a jail to a state facility mooted his claim under RLUIPA "because [RLUIPA] provides for only injunctive relief" and the plaintiff had not argued that now he would likely be held at the jail again. *Id.* at 364.

The Court agrees that Sand's claim under RLUIPA for injunctive relief is moot as a result of his release; however, the Court concludes that, as Sand asserts, damages are available. In *Thompson*—the case Milwaukee County relies on—the Seventh Circuit cited *Sossamon v. Texas*, 563 U.S. 277, 277-78 (2011), for the proposition that RLUIPA provides for only injunctive relief. But *Sossamon* focused on the issue of whether states had waived sovereign immunity by accepting federal funds. 563 U.S. at 283. *Sossamon* does not hold that damages are altogether unavailable under RLUIPA; it holds only that states have not waived their sovereign immunity to private suits for damages. As Sand points out, Milwaukee County is not a state and therefore does not enjoy sovereign immunity to suits for money damages.

Further, the Supreme Court recently decided that the phrase "appropriate relief" in RLUIPA's sister statute The Religious Freedom Restoration Act includes claims for money damages. *See Tanzin v. Tanvir*, 141 S.Ct. 486491 (2020). Although the Seventh Circuit has not decided how RLUIPA's "appropriate relief" should be interpreted in light of *Tanzin*, the Court finds the Supreme Court's reasoning in *Tanzin* applies with equal force to that phrase in RLUIPA.

That said, RLUIPA expressly states that "[n]othing in this chapter shall be construed to amend or repeal the Prison Litigation Reform Act . . . ." 42 U.S.C. §2000cc-2(e). Section 1997e(e) of the PLRA provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody

26

without a showing of physical injury." Accordingly, while compensatory damages are not available to Sand, nominal and punitive damages are. *See Calhoun v. DeTella*, 319 F.3d 936, 940-41 (7th Cir. 2003).

Sand's RLUIPA claim survives summary judgment for the same reason his First Amendment claim does. Namely, in light of the conflicting evidence discussed earlier in this decision, the Court must leave it to a jury to decide whether Milwaukee County's policy of offering a lacto-ovo diet in response to Sand's request for a kosher diet was the least restrictive means of furthering its interest in simplifying jail operations and responsibly allocating jail resources.

### D. State Law Claims

Sand also alleged in his complaint that his deprivation of a kosher diet violated his rights under the Freedom of Conscience Clause at Article I, Section 18 of the Wisconsin Constitution. The Freedom of Conscious Clause is effectively Wisconsin's version of the First Amendment Free Exercise Clause in that it serves the "same dual purpose of prohibiting the establishment of religion by the state and protecting a person's free exercise of it." *State v. Miller*, 202 Wis. 2d 56, 62-63 (1996). Under Article I, Section 18, a plaintiff must prove that he or she has a sincere religious belief and that the state law at issue burdens that belief. Once a plaintiff proves a prima facie case, the burden shifts to the government to show a compelling state interest that cannot be served by a less restrictive alternative. *Eagle Cove Camp & Conf. Cntr, Inc. v. Town of Woodboro, Wisconsin*, 734 F.3d 673, 682 (2013).

Even assuming the Aramark Defendants are subject to Sand's state constitutional claim, the claim fails for the same reasons as his claim under the First Amendment. Aramark supplies meals to the House of Correction pursuant to its contract with Milwaukee County. Aramark does not decide who will be given a religious diet in response to a request, and it does not decide what

27

food will be served once a person's request for a religious diet is granted. Because Aramark lacked discretion to set or alter the policies regarding requests for religious diets, it is not responsible for any violation of Sand's rights that those policies may have caused.

As to the County Defendants, the Court finds that neither they nor Sand are entitled to summary judgment. A jury must consider whether, in light of the proposed alternative policies, the County Defendants' policy of providing a lacto-ovo diet to inmates requesting a kosher diet was the least restrictive means available.

Finally, the Court will dismiss Sand's fraud claims against the Aramark Defendants. As the Court explained in its decision granting in part Milwaukee County's motion to dismiss, Dkt. No. 32, Sand cannot pursue a fraud claim based on Chapter 97 of the Wisconsin Statutes or Chapter ATCP 90 because the Wisconsin legislature did not create a private right to enforce Chapter 97 and/or ATCP 90. Moreover, the enforcement authority for Chapter 97 "lies with the department of agriculture, trade, and consumer protection, not private litigants." Finally, Sand's remaining fraud claims must be dismissed because the Aramark Defendants are not engaged in trade or trade competition within the meaning of Wis. Stat. §100.20 or advertise any food product within the meaning of Wis. Stat. §100.183. And, even on the merits, Sand's fraud claim, which is premised on Aramark improperly labeling his food kosher, would fail. Aramark has explained that the label was applied only as a way of assisting in the food distribution process to ensure inmates were receiving the designated religious diet. Given that Sand was well aware the House of Correction lacked a kosher kitchen, no jury could reasonably conclude that Aramark was attempting to defraud Sand by using a kosher label.

28

## CONCLUSION

For these reasons, the Milwaukee County House of Correction, John Doe, and Jane Doe are **DISMISSED**; Sand's motion for summary judgment (Dkt. No. 66) and motion to strike and motion for leave to file additional evidence (Dkt. No. 98) are **DENIED**; the Aramark Defendants' motion for summary judgment (Dkt. No. 61) is **GRANTED** and the Aramark Defendants are **DISMISSED**; and the County Defendants' motion for summary judgment (Dkt. No. 49) is **GRANTED** only with respect to Sand's Equal Protection claim but **DENIED** in all other respects.

Dated at Green Bay, Wisconsin this 29th day of March, 2022.

s/ William C. Griesbach
William C. Griesbach
United States District Judge

29